COURT OF APPEALS
DECISION
DATED AND FILED

February 19, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2024AP1535**

STATE OF WISCONSIN

Cir. Ct. No.  2023TP8

IN COURT OF APPEALS
DISTRICT IV

IN RE THE TERMINATION OF PARENTAL RIGHTS TO C.D.M.,
A PERSON UNDER THE AGE OF 18:

J.R.P.,

PETITIONER-APPELLANT,

V.

W.P.M.,

RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Dodge County: MARTIN J. DE VRIES, Judge. *Affirmed*.

Before Nashold, J.[1]

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

¶1      This is an appeal of a jury verdict in a termination of parental rights ("TPR") case. J.R.P. ("the mother") petitioned to terminate the parental rights of W.P.M. ("the father") to C.D.M. ("the child"). The petition alleged that the father had abandoned the child and had failed to assume parental responsibility. At trial, the jury found that the father had neither abandoned the child nor failed to assume parental responsibility, meaning that the father's parental rights were not terminated and the TPR petition was dismissed. The mother appeals, arguing that the circuit court erred in denying her motion to change the jury's answer to a verdict question, a change that would have resulted in a finding of abandonment. Because I conclude that there was credible evidence to support the jury's answer to the verdict question, I affirm.

## BACKGROUND

¶2      Although the trial concerned allegations of both abandonment and failure to assume parental responsibility, on appeal the mother challenges only the verdict on abandonment.[2] More specifically, she challenges the jury's answer to one of the questions within the special verdict: whether the father had good cause for failing to communicate with the mother about the child during the period that the father was alleged to have abandoned the child.

¶3      As an aid to understanding the trial evidence, the abandonment statute at issue requires the petitioner, here, the mother, to show that the "child has been left by the [father] with any person, the [father] knows or could discover the whereabouts of the child and the [father] has failed to visit or communicate with

---

[2] As a result, I do not further discuss failure to assume parental responsibility.

the child for a period of 6 months or longer." *See* WIS. STAT. § 48.415(1)(a)3. It was not disputed at trial that the child was with the mother, and that the father knew of the child's whereabouts; the jury also concluded that the father failed to communicate with the child for six months or longer. The jury was therefore required to consider whether the father "had good cause for having failed to visit with" the child and for "having failed to communicate with" the child throughout the six-month or longer period. *See* § 48.415(1)(c)1. and 2. The jury found that the father had good cause for not communicating or visiting with the child. It was accordingly required to answer two more questions: whether the father communicated "about the child with the person or persons who had physical custody of the child" (here, the mother) during that period; and, if the father did not communicate with the mother, whether he had good cause for this lack of communication. *See* § 48.415(1)(c)3.a. and b. The jury found both that the father had not communicated with the mother about the child during the relevant period, and that he had good cause for his failure to do so. Accordingly, the father's parental rights were not terminated. On appeal, the mother challenges the jury's answer to only the last question: whether the father had good cause for failing to communicate with the mother about the child ("Question 7" on the verdict form).

¶4      The parties' child was born in 2016. Pertinent here, in March 2023, the mother filed a TPR petition raising abandonment under WIS. STAT. § 48.415(1)(a)3. The case proceeded to a jury trial. At trial, it was not disputed that the child lived with the mother, and not with the father, from May 2018 until the filing of the petition in March 2023. Much of the trial evidence concerned the father's contact with the child and with the mother, including the following.

¶5      Regarding visitation between the father and the child, the father had no visitation with the child from May 2018 through June 2020, during which time

the father was incarcerated. After his release, the father had one supervised visit with the child in March 2021, and another in October 2021. After the October 2021 visit, the order for visitation in the mother and father's family law case was amended to include a further condition the father had to meet in order to continue visitation: that he take a hair follicle test for drug use. The father did not take a hair follicle test, and thus did not visit with the child after October 2021.

¶6    Regarding communication between the father and the child, the mother testified that toward the end of the father's incarceration, there had been what "felt like a period of [a] year, maybe" during which the father did not communicate with the child (or with the mother). However, the father testified that he sent letters for the child throughout his incarceration, and he introduced photocopies of letters dated from mid-2018 through June 2020, the month he was released. The father also testified to making phone calls to the child during his incarceration, beginning in 2019.

¶7    The father testified that after his release in June 2020, he would call and talk with the child on the phone. The parties introduced numerous messages between the father and the mother that included discussions of him calling to speak with the child. The messages also included multiple texts from the father asking the mother to sign a stipulation that would permit the father to visit the child. The mother did not respond to these texts. The father also introduced letters he sent to the child in April, September, and October of 2022.

¶8    Regarding communication between the father and the mother about the child, the text messages introduced contained many such communications. The father also introduced three messages delivered in February and March 2022, via a specialized communication platform, discussing the child.

¶9     The mother testified that she let the father speak to the child from prison "if it was court appointed that he was allowed to" and that there were times that the court ordered that he was not.

¶10     The jury also heard evidence that the mother sought to minimize the father's involvement in the child's life.  In May 2018, near the beginning of the father's incarceration, the mother sent the father a text reading, in part, "You're a fucking psycho who's pathetic and will never man up[.]  You haven't support[ed] your son [h]is entire life[.]… [L]eave me alone[.]  I want nothing to do with you."  The mother also wrote a letter to the family court in August 2018 saying that she wanted the father to "sign over his rights" to the child because of his past actions.  The father testified that, while he was in prison, he arranged to have a Christmas gift sent to the child, but that he received word from the organization that sent the gift that it had been refused by the mother.

¶11     The father testified that he sent drawings and crocheting works to the child from prison, but he did not know if the child had received them.  He testified that he asked the mother whether the child was receiving the letters or items that he sent, but that the mother never responded to this question.  He therefore began sending letters for the child to his own father.

¶12     The father's own father testified that his son told him that he would call for the child on the days calls were scheduled, and that the mother would say the child did not want to talk with the father, or "there was always some reason not to talk."

¶13     After the father was released from prison, the mother testified that he would reach out to her asking what, specifically, he could do to get the child back into his life.  She further testified that she did not give the father answers to this

question. She testified that this was because she did not want the father in the child's life. The jury also heard prior deposition testimony from the mother that she did not want the father in the child's life because of the father's past decisions that led to his incarceration.

¶14 As part of a custody evaluation for the family court, the mother wrote in August 2021 that she "realistically would like rights taken from [the father] but know[s] that most likely won't happen."

¶15 The jury also heard testimony from the director of Dodge County Family Court Services, who had worked with the mother and the father as the Parenting Plan Evaluator. The director identified a memo she had drafted to the family court in which she reported that the father had "not been involved in [the child's] life for a substantial amount of time due to [the father's] life choices and resistance by the mother." The director explained that "[t]hroughout [her] investigation for the parenting plan evaluation, [the mother] did not -- there was resistance as far as wanting to reintroduce [the father] into [the child's] life." However, the director also testified that the mother cooperated with the director's requests for supervised contact.

¶16 The director testified that the father called her saying that he was having "issues" securing phone contact with the child, despite there being a court order in place permitting these calls. She also identified an email from February 2022 in which the father informed the director that the mother had not been allowing him phone calls with the child.

¶17 After the close of evidence, the parties stipulated that the circuit court could answer the first two questions on the special verdict form, finding that the father had left the child with another person (the mother) and that the father

had known of the child's whereabouts. The jury answered the remaining questions, finding that: the father failed to visit or communicate with the child for a period of six months or longer; the father had good cause for his failure both to visit and communicate with the child during this period; the father failed to communicate with the person with custody (the mother) about the child during this period; and the father had good cause for failing to communicate with the mother during this period. The court granted judgment on the jury's verdict, meaning that the father retained his parental rights.

¶18    The mother then filed a motion requesting, as pertinent here, a change to the jury's answer to Question 7: whether the father had "good cause for having failed to communicate about [the child] with the person having physical custody during" the period when he also did not visit or communicate with the child.[3] The motion argued that there was no evidence to sustain the jury's "yes" answer to this question, and asked the circuit court to change it to "no." After briefing, the court denied the motion in an oral ruling. The court stated that, viewing the evidence most favorably to the father,

> there are definitely ways that the jury could infer that [the father] had good cause for not contacting the mother here.
>
> The evidence is what she had done. She threw out his letters. She basically didn't want [the father] in [the child's] life. That was clear. She wouldn't let [the father]

---

[3] In the circuit court, the mother also requested a judgment notwithstanding the verdict pursuant to WIS. STAT. § 805.14(5)(b), appearing to argue that the father's failure to take a hair follicle test *after* the verdict justified judgment notwithstanding the verdict. On appeal, the mother makes only passing reference to this request for judgment notwithstanding the verdict and develops arguments only as to the circuit court's denial of her request for change of verdict. Thus, this opinion does not further discuss the request for judgment notwithstanding the verdict. *See* **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("We may decline to review issues inadequately briefed.").

contact [the child] at particular times, which there is good reason for that, too. I am not saying that at all.

I am not trying to decide what I would say as a juror here, but I am looking at what this jury decided and was there anything in the evidence where they could make an inference that he had good cause.

Like I said, the jury could certainly infer that [the mother] was trying to keep [the child] away from [the father]. And there was evidence of this.

And if she was committed to not allowing [the father] back into [the child's] life, then the jury could infer that he had cause not to contact [the mother] because such communication would likely be futile.

He did make efforts to be involved in [the child's] life.

He testified about gifts that he tried to give to the child and letters that he had sent. He did certainly make efforts to get ahold of the child and it's clear that he cared about the child.

And I don't know what went on with the jury here. Obviously, nobody here does, but I don't think the standard [for a change of verdict] has been met here.

¶19 The circuit court entered an order dismissing the TPR petition. The mother appeals.

## DISCUSSION

### I. General principles and standard of review.

¶20 In Wisconsin, there is a "two-part statutory procedure" for an involuntary termination of parental rights. ***Steven V. v. Kelley H.***, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. In the first factfinding or "grounds" phase, the petitioner must prove the existence of "one or more of the statutorily enumerated grounds for termination of parental rights" by clear and convincing

evidence.  *Id.*; WIS. STAT. § 48.31(1).  If such grounds are found to exist, the circuit court then proceeds to the second, or "dispositional" phase, in which it decides whether it is in the best interests of the child or children that the parent's rights be terminated.  *Steven V.*, 271 Wis. 2d 1, ¶27; WIS. STAT. § 48.426(2).  Here, the jury found that the grounds for termination alleged against the father were not satisfied, so the proceedings terminated after the first phase.

¶21    As noted, the mother challenges the jury's verdict on abandonment.  More specifically, she challenges the answer to Question 7: whether the father had "good cause for having failed to communicate about [the child] with [the mother]" during the six-month or longer alleged abandonment period.  She argues that the jury's answer to Question 7 should be changed because there was no credible evidence to support the jury's "yes" answer.

¶22    An appellate court reviews a request to change a jury answer using the same standard as the circuit court.  Accordingly, I must affirm if "there is any credible evidence which, when reasonably viewed, and considered in the light most favorable to the verdict, fairly admits an inference which supports the findings" made by the jury.  *Finken v. Milwaukee Cnty.*, 120 Wis. 2d 69, 76, 353 N.W.2d 827 (Ct. App. 1984).  This "any credible evidence" standard is extremely deferential to the jury's verdict: "any [supporting] evidence other than mere conjecture or incredible evidence" meets the standard.  *Wisconsin Nat. Gas v. Ford, Bacon & Davis Constr. Corp.*, 96 Wis. 2d 314, 338, 291 N.W.2d 825 (1980).  "When there is *any* credible evidence to support a jury's verdict, 'even though it be contradicted and the contradictory evidence be stronger and more convincing, nevertheless the verdict ... must stand.'"  *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 389-90, 541 N.W.2d 753 (1995) (alteration and emphasis in original) (quoted source omitted).  Further, the notion of "credible" evidence in

this context is quite broad; evidence is credible unless it is "'in conflict with the uniform course of nature or with fully established or conceded facts.'" **Wisconsin Nat. Gas**, 96 Wis. 2d at 338 (quoted source omitted).[4]

### II. There was credible evidence supporting the jury's answer to Question 7.

¶23    I conclude that the circuit court properly denied the mother's motion to change the jury's answer to Question 7 because there was credible evidence supporting the jury's good cause finding.  The jury was instructed, consistent with WIS JI—CHILDREN 314, that in determining good cause it could consider

> whether the child's age or condition would have rendered any communication meaningless;
>
> Whether [the father] had a reasonable opportunity to visit or communicate with the child or communicate with [the mother] who had physical custody of the child;
>
> Attempts to contact the child;
>
> Whether the person with physical custody of the child prevented or interfered with the efforts by [the father] to visit or communicate with the child;
>
> Any other factors beyond the parent's control which precluded or interfered with visitation or communication;

---

[4] The mother suggests that the circuit court was obligated to grant her motion to change the jury's verdict if it was clearly erroneous: that is, "against the great weight and clear preponderance of the evidence."  This is incorrect.  In a civil matter, a circuit court may, in its discretion, grant a new trial under this standard.  WIS. STAT. § 805.15(1); **Sievert v. American Fam. Mut. Ins. Co.**, 180 Wis. 2d 426, 433, 509 N.W.2d 75 (Ct. App. 1993), *aff'd*, 190 Wis. 2d 623, 528 N.W.2d 413 (1995).  But the mother did not move for a new trial; she instead requested that the court change the jury's answer to a verdict question.  Such a motion can be granted only under the "more stringent" "no credible evidence" standard.  **Sievert**, 180 Wis. 2d at 433-34 ("[V]erdicts can be against the great weight of evidence even though supported by credible evidence."); WIS. STAT. § 805.14(1), (5)(c).

And all other evidence presented at this trial on this issue.

¶24    While some of these factors appear applicable only to a lack of visitation or communication with the child—for example, whether the child's age would render communication meaningless—others could bear on a failure to communicate with the mother about the child: "[w]hether [the father] had a reasonable opportunity to … communicate … with [the mother] who had physical custody of the child"; "[a]ny other factors beyond the parent's control which precluded or interfered with … communication"; and the catch-all "[a]ll other evidence presented at this trial on this issue."

¶25    As the circuit court noted, there was evidence introduced that the mother, in addition to resisting the father's attempts to communicate with the child, also precluded or interfered with the father's ability to communicate with her about the child.  For example, early in the father's period of incarceration, the mother texted him that he should "leave [her] alone."  At some point, the mother texted the father that "unless you are calling to talk to [the child] I don't need text[s] from you."  At another time, the father texted the mother asking whether the child was okay, and why the mother would not let the father talk with the child.  The mother replied that she was "busy doing stuff and I wasn't by my phone [and] lost track of time."  On one occasion, the mother texted the father that if he really cared for the child, "you'd think about what's best for [the child] and that would be you letting [the child] be because [the child is] happy and healthy and well taken care of by my husband and me."  On another occasion, the mother texted the father "[p]lease do not text me[;] nothing will be done until I talk to my lawyer and the guardian."  Further, as noted above, the jury heard testimony that while the father was incarcerated, the mother would not respond to the father's

questions about whether the child was receiving the letters or other items that the father sent. Nor would the mother respond to the father's questions about what actions he could take that would permit him to be more involved with the child.

¶26 None of this evidence is "'in conflict with the uniform course of nature or with fully established or conceded facts'"—that is, it constitutes credible evidence. ***Wisconsin Nat. Gas***, 96 Wis. 2d at 338 (quoted source omitted). Specifically, it constitutes credible evidence of factors beyond the father's control that either precluded or interfered with his ability to communicate with the mother about the child. *See* WIS JI—CHILDREN 314. Thus, consistent with the jury instruction, there was credible evidence supporting the jury's finding of good cause.

¶27 The mother offers several arguments to the contrary, but none are persuasive. First, she relies heavily on the fact that, according to the family court order, the father was prevented from having visits with the child by the father's refusal to take a hair follicle test. The mother argues that it was the father's choice not to take the test, and that "[h]is choices are not good cause."

¶28 However, the mother does not explain what relevance this argument has to the sole issue she raises on appeal: whether there was any credible evidence that the father had good cause for not communicating *with the mother* about the child. The hair follicle test was a condition the father had to meet in order to have court-ordered visitation with the child. There was no such legal barrier to the father's communicating with the mother about the child. The jury heard that the father did attempt to communicate with the mother about the child, and that at least in some instances, the mother refused to engage in such communication. The mother offers no logical argument that the absence of a hair follicle test bears on

whether the mother's refusal "precluded or interfered with" the father's attempts to communicate with the mother about the child.  WIS JI—CHILDREN 314.

¶29    The mother also devotes a great deal of her argument to discussing the father's abusive, antisocial, illegal, and dangerous behavior before his incarceration.  Similarly, the mother highlights her own testimony about aspects of the father's letters and phone calls to the child that she regarded as inappropriate for a child.  To the extent that she develops an argument, the mother seems to be suggesting that she had good reason for resisting the father's attempts to communicate with her or the child.

¶30    As the circuit court noted, there was evidence that the mother had "good reason" for not wishing to communicate with the father.  But the statute did not require the jury to determine the reasonableness of the mother's actions.  Instead, it required the jury to decide whether the father had "good cause" for not communicating with the mother about the child during a certain period.

¶31    Moreover, given that the jury did find good cause, it is not for the courts to reweigh the evidence for and against good cause.  When a party requests a change to a jury's verdict answer, courts do not ask what evidence there is against the answer the jury gave; they instead ask whether there was any credible evidence in support of the jury's answer.  *Weiss*, 197 Wis. 2d at 389-90 (verdict stands if supported by any credible evidence "'even though it be contradicted and the contradictory evidence be stronger and more convincing'" (quoted source omitted)).  Evidence that the father was not afforded a reasonable opportunity to communicate with the mother about the child, because the mother precluded or interfered with such communication, is evidence from which the jury could determine that there was "good cause" for the father's lack of communication.

13

Therefore, even strong evidence that would tend to undermine a finding of good cause would not permit a court—either the circuit court or this court—to change the jury's answer. Having identified credible evidence in support of the jury's finding, this court's circumscribed inquiry is complete. *Id.* The jury verdict must stand.

¶32 The mother also suggests that case law restricts "good cause" to circumstances that prevent, rather than inhibit, communications. Despite referring to "case law," the mother cites no case for the proposition that "good cause" for lack of communication requires that communication be impossible. Further, such a rule would be contrary to the jury instructions, which permit consideration of circumstances which "preclude[] *or interfere[]* with" communication. WIS JI—CHILDREN 314; *State v. Rardon*, 185 Wis. 2d 701, 706, 518 N.W.2d 330 (Ct. App. 1994) (pattern jury instructions, while not precedential, carry persuasive authority for interpreting statutes).

¶33 The mother further argues that *Walworth County DHHS v. Andrea O.*, No. 2010AP2938, unpublished slip op. (WI App Feb. 23, 2011), is persuasive here. In that case, the mother, whose rights to her daughter were terminated, sought to have the jury's verdict changed. *Id.*, ¶3. The jury had found the mother did not have good cause for failing to communicate with her daughter while the mother was incarcerated. *Id.* This court affirmed the circuit court's refusal to change the jury's answer, noting that there was credible evidence from which the jury could have found a lack of good cause. *Id.*, ¶¶12-13.

¶34 The mother's reliance on *Andrea O.* is misplaced. While the mother points to certain factual similarities between that case and this one, she wholly ignores the applicable standard of review. As stated above, this court cannot

14

change a jury verdict unless there is no credible evidence supporting it. *Weiss*, 197 Wis. 2d at 389-90. In *Andrea O.*, there was credible evidence supporting the jury's verdict finding an absence of good cause; this court was thus obligated to affirm. *Andrea O.*, No. 2010AP2938, ¶¶12-13. In this case, there is also credible evidence supporting the jury's verdict, but the verdict is that good cause was present; therefore, this court is again obligated to affirm. Whatever factual similarities exist between the two cases, the dispositive fact is that the juries reached opposite verdicts. If this court were to compare the evidence in the two cases in an attempt to make their outcomes—that is, termination of the parent's rights—"match," it would be ignoring the statutorily mandated standard of review and invading the province of the jury. The other unpublished cases the mother cites are similarly unhelpful, as they do not concern attempts to change a jury answer. Glancing factual similarities between cases do not dictate identical results, particularly when their procedural postures differ.

### III. The mother presents no basis for this court to narrow the statutory phrase "good cause."

¶35 The mother perfunctorily asserts that the phrase "good cause" is "inadequately defined in both Wisconsin Statutes and published case law" and that the jury instruction used here, WIS JI—CHILDREN 314, does not provide sufficient guidance for the judiciary, trial counsel, or the jury. She therefore requests that this court issue an opinion "that lays out what 'good cause' is." The mother does not offer a particular construction of "good cause"; her argument seems to be that whatever that phrase means, it must mean something different than the jury here was instructed.

¶36 "Good cause," in this context, is a statutory phrase, enacted by the legislature in 1996. *See* WIS. STAT. § 48.415(1)(c)1.-3.; 1995 Wis. Act 275, § 74.

15

The statute does not define the phrase, nor does it offer further guidance, other than to say that a person may have good cause for failing to communicate with a child too young to communicate or otherwise incapable of communication. *See* § 48.415(1)(c)3.; 1995 Wis. Act 275, § 74. Thus, the legislature seems to have entrusted to the jury the determination of what, in a particular case, constitutes "good cause." In this case, the mother fails to develop an argument as to what the statutory phrase "good cause" ought to mean that would change the outcome here, and I reject her argument for that reason. ***Pettit***, 171 Wis. 2d at 646 ("We may decline to review issues inadequately briefed.").

## CONCLUSION

¶37 The circuit court's order dismissing the TPR petition is affirmed.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.